## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| Cordelle J. Miller, | |
| Plaintiff, | |
| v. | No. 15-cv-11746 |
| Mark Mascillino, Raheem Murphy, Jeffrey Anderson, and Lake County, | Honorable Nancy L. Maldonado |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cordelle Miller brings a complaint against Lake County and Officers Mascillino, Murphy, and Anderson, alleging violations of his Eighth and Fourteenth Amendment rights. (Dkt. 26.) Defendants moved for summary judgment. (Dkt. 58.) For the reasons stated below, the motion is granted in part and denied in part.

## Background[1]

### I. Facts

The following facts are undisputed, unless otherwise indicated. Miller entered the Lake County Jail ("LCJ") in November 2015 as a pretrial detainee. (Dkt. 52 ¶ 1.)[2] LCJ is a direct supervision facility, meaning the corrections officers supervise, manage, and transport inmates within LCJ as well as to and from courthouses and other similar facilities. (*Id.* ¶ 8.) LCJ houses inmates in either the General Population or the Administrative Segregation Unit ("ASU"). (*Id.*

---

[1] In citations to the record, page numbers are taken from CM/ECF headers on filings except when the Court cites deposition testimony, in which case the Court cites the internal transcript page and line number.

[2] Dkt. 52 is a single document that compiles Defendants' opening statement of facts (Dkt. 42), Plaintiff's amended responses (Dkt. 51), and Defendants' replies.

¶ 9.) The General Population includes most of LCJ's inmates. (*Id.* ¶ 10.) Inmates in the General Population are free to move within a pod of approximately 40–60 inmates. (*Id.*)

The ASU houses inmates who are deemed unsuitable for the General Population. (*Id.* ¶ 11.) Inmates in the ASU are confined to their cells for 23 hours a day and have one hour per day to leave their cells and attend to hygiene, exercise, phone calls, or other activities. (*Id.* ¶ 11.) The free hour is staggered throughout the day for each inmate. (*Id.* ¶ 11.) LCJ policy dictates that in the ASU, only one inmate should be out of a cell at any given time. (*Id.* ¶ 12.)

LCJ policy also requires that certain inmates—whether in the General Population or the ASU—be kept separate from each other for safety purposes. (*Id.* ¶ 13.) LCJ designates this "keep separate" status on the back of an inmate identification card, which is kept in the possession of corrections officers. (*Id.* ¶ 13.)

Because most LCJ inmates are pretrial detainees, corrections officers often escort inmates out of their pods to attend court appearances. (*Id.* ¶ 14.) Corrections officers ordinarily bring inmates out of their individual pods to a large holding cell with multiple inmates. (*Id.*) From there, individual inmates are escorted to courtrooms or external courthouses. (*Id.*) One large holding cell in the booking area of LCJ is known as "B12," or the "bullpen." (*Id.* ¶ 16.) B12 can hold approximately 30–40 inmates at once. (*Id.*)

This case involves two separate incidents that occurred 11 days apart, one in B12 and another in the ASU.[3]

---

[3] There is no apparent connection between the two incidents. But no party has raised the question of joinder, and the issues and number of defendants are not so overwhelming that the Court must raise joinder *sua sponte*. *Cf. George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *Estée Lauder Cosms. Ltd. v. P'ships & Uninc. Ass'ns Identified on Schedule A*, 334 F.R.D. 182, 186 (N.D. Ill. 2020).

A.      **The B12 Incident**

On November 10, 2015, Miller was scheduled to go to court at an external facility in McHenry County for his pending criminal case. (Dkt. 52 ¶ 17.) Officer Mark Mascillino, a corrections officer employed by the Lake County Sheriff, escorted Miller from his cell to B12. (*Id.* ¶¶ 2, 17.) While riding the elevator with Officer Mascillino and other inmates down to B12 (located on the first floor), the elevator stopped at an intermediate floor and Miller noticed another inmate, Reggie Bryant, about to enter the elevator. (*Id.* ¶¶ 16, 18; Dkt. 42-2, Miller Dep., at 91:21–96:9.) Miller and Bryant were under a keep-separate order, as Miller believed that Bryant had been involved in the murder of a close friend named Travon Beech. (Dkt. 52 ¶ 23.) Bryant did not have room to enter the elevator, which was full. (*Id.* ¶ 18.)

Recognizing that Bryant would go into B12, Miller told Officer Mascillino that he— Miller—did not belong in B12 because he was going "external," meaning going to an external courthouse. (*Id.* ¶¶ 17–18.) The parties dispute other details of this interaction between Officer Mascillino and Miller, particularly whether Officer Mascillino knew of the keep-separate order related to Miller and Bryant. Miller testified at his deposition that he informed Officer Mascillino that Bryant, a keep-separate, would be in B12 (Dkt. 42-2, Miller Dep., at 93:16–94:15, 101:4– 103:8), but Officer Mascillino does not recall Miller telling him anything about Bryant or any other of his keep-separates.[4] (Dkt. 52 ¶ 19.)

After placing Miller in B12, Officer Mascillino radioed to external transport officers to notify them that Miller was in B12 and ready to be taken out of the facility. (*Id.* ¶ 21.) The external transport officers informed Officer Mascillino that they had received his message and were en

---

[4] Although Defendants' statement of facts says Officer Mascillino does not *recall* whether Miller told him anything about Bryant or any other keep-separates, Mascillino testified that Miller did not tell him about Bryant being a keep-separate. (Dkt. 52 ¶ 19; Dkt. 42-3, Mascillino Dep., at 65:14–16, 71:15–17.) Whether Miller told Officer Mascillino about Bryant being a keep-separate is therefore clearly in dispute.

route. (*Id.*) But while Miller was still in B12 awaiting transport, Bryant was also placed into B12. (*Id.* ¶ 25.) Miller initially backed away, but then Bryant and Miller charged each other and proceeded to punch and wrestle. (*Id.* ¶¶ 25–28.) After the fight ended, external transport officers brought Miller to court in McHenry County. (*Id.* ¶ 31.) Miller alleges injuries to his knee, leg, and back after this incident. (*Id.*)

**B.    The ASU Incident**

On November 21, 2015, Miller was an inmate in the ASU section of the LCJ. (Dkt. 52 ¶ 37.) That evening, Miller spent his free hour in a section of the ASU known as the "day room." (*Id.* ¶ 38.) The day room included a telephone, workout equipment, a table, and a shower, all of which the inmates could use. (*Id.*) While in the day room, Miller was sitting or squatting on the floor and speaking on the phone to an acquaintance, Latoyra Beech. (*Id.* ¶ 39.) Meanwhile, Officers Murphy and Anderson, Lake County Sheriff corrections officers, transported ASU inmate Jonathan Williams, who carried a food tray, through the day room. (*Id.* ¶¶ 40–42; Dkt. 42-4, Murphy Dep., at 5:10–14; Dkt. 42-5, Anderson Dep., at 9:11–10:3.) Officers Murphy and Anderson contend that they were unaware that Miller was in the day room. (Dkt. 52 ¶ 41.)

Miller alleges that Williams struck Miller with the food tray, causing injury. (*Id.* ¶ 43.) Defendants argue that Williams only *attempted* to do so. (*Id.*; Dkt. 58 at 10.) Officer Murphy moved to protect Miller, and Officer Anderson hustled Williams through a door and out of the day room. (Dkt. 52 ¶ 44.) When Officers Murphy and Anderson returned to the day room approximately 30 minutes later to check on Miller, Miller said, "I'm good," and did not request medical attention at that time. (*Id.* ¶¶ 47–48.) Miller returned to his phone call without further incident or discussion with the officers, and Murphy and Anderson returned to their duties. (*Id.* ¶ 49.) Miller requested medical attention the next day. (*Id.* ¶ 48.)

Miller remained on the phone with Latoyra Beech throughout this entire incident in the ASU. (*Id.* ¶ 53.) During discovery, a contemporaneous audio recording of the phone call was produced. (*Id.* ¶ 52.) On the recording, Miller repeatedly states to Latoyra Beech and others within the ASU that Williams tried to hit him with a tray. (*Id.* ¶¶ 53–54; Dkt. 42-2, Miller Dep., at 189:11– 191:15, 197:1–3; Dkt. 78, second link at 26:01–26:16, 27:00–27:33.) Miller also tells a third party that he was "good" after the incident and did not require medical attention. (Dkt. 52 ¶ 53.) Although the Amended Complaint alleges that Miller suffered a fractured finger (Dkt. 26 at 3 ¶ 6), Miller testified at his deposition that he did not sustain a fracture to any part of his body, including his hand or finger, as a result of the incident with Williams in the ASU. (Dkt. 52 ¶¶ 55, 57; Dkt. 42-2, Miller Dep., at 169:22–170:15, 205:7–15.) Miller does not dispute that he admitted he did not suffer a fractured finger due to the ASU incident, but notes that he also testified that a physician told him he suffered a torn tendon due to the incident. (Dkt. 52 ¶ 55; Dkt. 42-2, Miller Dep., at 170:2–172:15.)

Miller brings Eighth and Fourteenth Amendment claims under 42 U.S.C. § 1983 against Lake County and its agents, Officers Mascillino, Murphy, and Anderson, in their individual and official capacities, for the injuries that Miller allegedly sustained from the B12 and ASU incidents at LCJ. (Dkt. 26 at 3.) Miller alleges that Defendants were deliberately indifferent to a substantial risk of serious harm to Miller. (*Id.* at 3.) Defendants moved for summary judgment. (Dkt. 41.)

After the parties briefed the motion for summary judgment, the Seventh Circuit decided *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018), which concluded "that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley* [*v. Hendrickson*, 576 U.S. 389 (2015)]," rather than the Eighth Amendment's subjective deliberate indifference standard. *Miranda*,

5

900 F.3d at 352. The Court denied Defendants' motion for summary judgment without prejudice and afforded Defendants the opportunity to file a new motion for summary judgment addressing the viability of Miller's claims under *Miranda*. (Dkt. 54.) Defendants filed a new motion for summary judgment. (Dkt. 58.) The case was then reassigned to another judge and ultimately reassigned again to the undersigned judge. (Dkts. 63, 81.)

## II. Northern District of Illinois Local Rule 56.1

As a preliminary matter, at summary judgment the relevant facts are derived from the parties' Local Rule 56.1 submissions. The Court will first discuss the requirements of the local rule in effect at the time of briefing.

First, Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." L.R. 56.1(a)(3); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). "The statement . . . shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a).

Second, the party opposing summary judgment must file *both* a response to the moving party's statement and a statement of any additional facts. Specifically, the party opposing summary judgment must file "a concise response to the movant's statement that shall contain: . . . (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). The opposing party

must also include in its response "(C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C).

Third, if the nonmovant submits a statement of additional facts, the movant "may submit a concise reply." L.R. 56.1(a). "All material facts set forth in the statement [of additional facts] filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party." *Id.*

The rule helps identify, from within what is often a voluminous record, the facts and materials relevant to the summary judgment motion. Thus, a party's failure to comply with the rule may lead to a party's facts being disregarded or even the other party's facts being deemed admitted. L.R. 56.1(a), (b)(3)(C); *see Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

Defendants filed a statement of facts pursuant to Local Rule 56.1 (Dkt. 42), Miller filed a response (Dkt. 51), and Defendants filed a reply (Dkt. 52). Not all the denials in Miller's response are supported with citations to the record. Where Miller's denials do not cite an evidentiary basis, the Court may decline to credit them. *See KFC Corp. v. Iron Horse of Metairie Rd., LLC*, No. 18 C 5294, 2020 WL 3892989, at *6 (N.D. Ill. July 10, 2020); *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018), *aff'd*, 926 F.3d 409 (7th Cir. 2019).

In addition, Miller did not file his own statement of additional facts. Rather, Miller introduced additional facts in his response to Defendants' facts (Dkt. 51) and in his response brief (Dkt. 46). Introducing facts in this manner violates Local Rule 56.1, which is designed to clearly identify the potential factual disputes and supporting citations to record evidence, both for the opposing party to respond and for the Court to consider. *See Ciomber*, 527 F.3d at 643; *Ammons*, 368 F.3d at 817; *KFC Corp.*, 2020 WL 3892989, at *7. Defendants filed a reply to Miller's response, but given the format in which Miller introduced the additional facts, it is not always clear whether the facts are controverted. The Court "is not obligated to scour the record looking for factual disputes" and may "strictly enforce Local Rule 56.1" by looking only "to evidence that is properly identified and supported in the parties' Rule 56.1 statements." *KFC Corp.*, 2020 WL 3892989, at *7 (citations, internal quotation marks, and brackets omitted). As a result, the Court declines to rely on Miller's additional facts where it deems appropriate.

Nevertheless, the Court views the evidence that complies with Local Rule 56.1 in the light most favorable to Miller, the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bay Area Bus. Council, Inc.*, 423 F.3d at 634.

## Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "substantive law will identify which facts are material." *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation and footnote omitted). Construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.* (citation omitted).

## Analysis

Miller brings § 1983 claims against Officers Mascillino, Murphy, and Anderson in both their personal and official capacities, as well as against Lake County. (Dkt. 26 at 1–2.)

To state a claim under § 1983, a plaintiff "must allege that a government official, acting under color of state law, deprived them of a right secured by the Constitution or the laws of the United States." *Christensen v. Cnty. of Boone, IL*, 483 F.3d 454, 459 (7th Cir. 2007) (citations omitted); 42 U.S.C. § 1983. The Court addresses first Miller's claims against the officers in their official capacity and against Lake County, then the claims against the officers in their personal capacity, and finally Defendants' argument that qualified immunity precludes liability for any remaining claims.

### I. Official-Capacity and Municipality Claims

A § 1983 suit against an officer in his official capacity is generally treated as a suit against the entity of which the officer is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)

("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Hernandez v. O'Malley*, 98 F.3d 293, 297 (7th Cir. 1996). The Court therefore analyzes the official-capacity claims against the officers as claims against Lake County.

To bring a claim against a municipality under § 1983, a plaintiff must satisfy the requirements of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, "a municipality can be liable under § 1983 only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Monell*, 436 U.S. at 694). There are "three bases for municipal liability" under *Monell*: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel*, 916 F.3d at 617 (citation and internal quotation marks omitted).

The Amended Complaint does not identify any express policies, widespread practices or customs, or acts of a final Lake County or LCJ decisionmaker. Instead, the Amended Complaint discusses isolated acts by Defendants in their individual capacities. Nor, as required at summary judgment, has Miller identified evidence creating a genuine issue of fact for the jury on a *Monell* claim. Accordingly, Miller cannot proceed against Lake County on a *Monell* claim. Nor can Miller proceed against Officers Mascillino, Murphy, or Anderson in their official capacities, which as explained above is effectively proceeding against Lake County.

## II. Individual-Capacity Claims

Miller brings a § 1983 claim against Officers Mascillino, Murphy, and Anderson in their individual capacities—against Officer Mascillino for the B12 incident and against Officers Murphy and Anderson for the ASU incident.

Defendants characterize Miller's claim as a conditions-of-confinement claim. (Dkt. 58 at 11.) While this characterization is accurate, it is more precisely described as a failure-to-protect claim, which is a kind of conditions-of-confinement case. *See Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) ("The [Eighth] Amendment also imposes duties on these [prison] officials, who must provide humane conditions of confinement; prison officials must . . . take reasonable measures to guarantee the safety of the inmates. In particular, as the lower courts have uniformly held, and as we have assumed, prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.") (internal quotation marks and citations omitted); *see also Kemp v. Fulton Cnty.*, 27 F.4th 491, 494 (7th Cir. 2022) ("Correctional officials who are deliberately indifferent to inhumane conditions of confinement, including violence behind bars, may be held liable under 42 U.S.C. § 1983.").

The Amended Complaint alleges violations of both the Eighth and Fourteenth Amendments. (Dkt. 26 at 2–3.) The Eighth Amendment's ban on cruel and unusual punishment covers § 1983 claims brought by inmates after sentencing. *See* U.S. Const. amend. VIII; *Lewis v. Downey*, 581 F.3d 467, 473–74 (7th Cir. 2009); *Jones*, 2020 WL 1433811, at *3. Because pretrial detainees have not been convicted or sentenced, they "may not be 'punished' by the state in any way." *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996); *see also Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). Thus, § 1983 claims brought by pretrial detainees, including Miller's claim here, arise under the Fourteenth Amendment's Due Process Clause rather than the

11

Eighth Amendment's Cruel and Unusual Punishment Clause. *See id.*; *Kemp*, 27 F.4th at 495–97; *cf. Jones v. Barber*, No. 17-cv-07879, 2020 WL 1433811, at *3 (N.D. Ill. Mar. 24, 2020).

To establish a Fourteenth Amendment claim, a pretrial detainee must meet the standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). *See Pittman by & through Hamilton v. Cnty. of Madison, Ill.*, 970 F.3d 823, 827 (7th Cir. 2020); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019); *McCann v. Ogle Cnty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018); *Miranda*, 900 F.3d at 351–54. Under the *Kingsley* standard, first a plaintiff must show that defendants "acted purposefully, knowingly, or perhaps even recklessly." *Pittman*, 970 F.3d at 827; *Miranda*, 900 F.3d at 353; *McCann*, 909 F.3d at 886. This inquiry "encompasses all states of mind except for negligence and gross negligence." *Pittman*, 970 F.3d at 827–28; *see also Miranda*, 900 F.3d at 353; *McCann*, 909 F.3d at 886. In other words, accidental, unintentional, or negligent actions by defendants do not suffice. *See Kingsley*, 576 U.S. at 396.

Second, a plaintiff must show that defendants' conduct was "objectively unreasonable." *Kemp*, 27 F.4th at 495; *Miranda*, 900 F.3d at 351. Objective unreasonableness depends on "whether a reasonable officer in [the defendant's] shoes would have appreciated the risk that his actions entailed." *Kemp*, 27 F.4th at 497; *see also Kingsley*, 576 U.S. at 397 (noting that courts must make the determination of objective reasonableness "from the perspective of a reasonable officer on the scene"). When determining whether conduct was objectively unreasonable, courts look at "the facts and circumstances of each particular case" and "account for the legitimate interests" of the "need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to . . . maintain institutional security." *Kingsley*, 576 U.S. at 397 (internal quotation marks and citations omitted).

*Kingsley*, which set forth these principles, involved an excessive force claim. 576 U.S. at 391. The Seventh Circuit extended *Kingsley*'s standard to medical treatment claims in *Miranda*. 900 F.3d at 352. In the case at bar, after the parties briefed this motion for summary judgment, the Seventh Circuit extended *Kingsley*'s standard to conditions-of-confinement claims. *Hardeman*, 933 F.3d at 823; *see also McWilliams v. Cook Cnty.*, No. 15 C 53, 2018 WL 3970145, at *5 (N.D. Ill. Aug. 20, 2018) ("*Miranda*'s logic reaches the broader genus of conditions of confinement claims . . . ."). And more recently, the Seventh Circuit held that *Kingsley*'s standard applies to pretrial detainees' failure-to-protect claims. *Kemp*, 27 F.4th at 497.

In short, Miller is not required to show that Defendants were *subjectively* "aware of a substantial risk of serious injury." *Kemp*, 27 F.4th at 497 (citation omitted); *see Hardeman*, 933 F.3d at 822–23; *cf. McCann*, 909 F.3d at 886. Rather, Miller need only show that Defendants behaved purposely, knowingly, or recklessly, and that their conduct was objectively unreasonable.[5]

As noted above, Miller's failure-to-protect claim involves two separate incidents: (1) the B12 incident, and (2) the ASU incident.

### A. The B12 Incident

Defendants make three arguments related to the B12 incident, which involved Officer Mascillino. First, Defendants argue that the B12 incident did not result in a serious injury and thus cannot constitute a Fourteenth Amendment violation. (Dkt. 58 at 18–20.) Second, Defendants argue that Officer Mascillino did not act unreasonably because he did not himself put Miller and Bryant together in B12. (*Id.* at 14–15.) Third, Defendants contend that even if Officer Mascillino

---

[5] Whether Miller was being held at Lake County Jail post-conviction and post-sentencing is not clear to the Court, but the parties agree that in November 2015 Miller was a pretrial detainee. Therefore, the objective reasonableness standard for Fourteenth Amendment cases applies and there is no subjective prong as there is in Eighth Amendment cases. (Dkt. 52 ¶ 1; Dkt. 58 at 12–13; Dkt. 61 at 5–6.) As discussed further below, *infra* Section III, even if Miller had not been a pretrial detainee and the Eighth Amendment standard applied here, summary judgment would still be inappropriate in light of the factual dispute as to whether Officer Mascillino subjectively knew that Bryant, a keep-separate, was on his way to B12.

did bring Bryant into B12, Miller has not presented evidence of behavior that rises above negligence or gross negligence as required by *Kingsley*. (*Id.* at 15.)

As to Defendants' first argument, the Seventh Circuit has explained that in the failure-to-protect context, "a beating suffered at the hands of a fellow detainee . . . clearly constitutes serious harm." *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). Miller also cites cases suggesting that courts evaluating the serious harm requirement in conditions-of-confinement cases (not the more specific subset of failure-to-protect cases) "look for physical injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (citation and internal quotation marks omitted).[6]

There is no dispute that Miller and Bryant were involved in a fight in B12. (Dkt. 52 ¶ 25.) In addition, Miller cites evidence of physical pain from the B12 incident. (*Id.* ¶ 32 (citing Dkt. 42-2, Miller Dep., at 245–48).) Miller testified at his deposition that he has experienced back pain "off and on" after Bryant slammed him into the concrete floor, and he sometimes receives medication for the pain. (Dkt. 42-2, Miller Dep., at 121:19–122:24, 246–48.) Miller also alleges that he suffered knee and leg pain and testified that he walked with a limp immediately after the B12 incident because his knee was injured. (*Id.* at 204:14–24, 247.)

Defendants acknowledge in their statement of facts that Miller testified about these injuries (Dkt. 52 ¶ 31), but Defendants argue that Miller's failure to request medical attention or even perceive the injuries on the day of the B12 incident means Miller's injuries were not serious enough to warrant relief under § 1983. (Dkt. 58 at 19.)

---

[6] *Gray v. Hardy* is an Eighth Amendment case.

The Court disagrees and finds that there is a genuine issue of material fact as to the extent of Miller's injuries. That is, Miller has provided sufficient evidence from which a reasonable factfinder could conclude that he suffered physical injuries to his knee and back that resulted in a limp affecting his ability to walk, as well as chronic "off and on" pain that has been treated repeatedly with pain medication. *See Gray*, 826 F.3d at 1006.

Defendants' second argument—that Officer Mascillino did not bring Bryant into B12—is not persuasive. As discussed above, the relevant questions under *Kingsley* are: (1) whether the defendant "acted purposefully, knowingly or perhaps even recklessly" (any mental state other than negligence or gross negligence); and (2) whether the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 351, 353. Regardless of whether Officer Mascillino brought Bryant into B12 himself, summary judgment is inappropriate because there is a genuine dispute as to whether Miller told Mascillino that Bryant, a keep-separate, was on his way to B12, the very holding area where Miller was being placed. A reasonable jury could therefore find: (1) that Officer Mascillino acted purposefully, knowingly, or recklessly (not accidentally, unintentionally, or negligently) when he placed Miller in B12; and (2) that doing so when Bryant was on the way was objectively unreasonable in light of the risk of assault.

Next is Defendants' third argument—that regardless of whether Officer Mascillino himself put Miller and Bryant together into B12, Officer Mascillino's conduct did not rise to the level of deliberate indifference. (Dkt. 58 at 15.) Miller argues in response that as soon as Miller informed Officer Mascillino that a keep-separate would be placed in B12 with Miller, "Officer Mascillino had an obligation to protect Mr. Miller's safety." (Dkt. 61 at 8.)

15

Summary judgment is inappropriate because, again, there is a dispute about what Miller told Officer Mascillino. Miller testified in his deposition that after everyone got off the elevator, he informed Officer Mascillino that he was not supposed to be in B12:

> And I'm trying to let [Officer Mascillino] know that my keep separate is going to go to that bullpen. . . . Mascillino was not trying to hear me when I was trying to explain that to him. . . .
>
> Q. What did you tell [Officer Mascillino] about your keep separate?
>
> A. That he's going to be in that bullpen. . . . The whole time I was explaining everything to him about external, the keep separate, I told him everything when I got off the elevator, before they put me in the bullpen."

(Dkt. 42-2, Miller Dep., at 101:4–103:8.) Miller further testified that approximately two minutes after Officer Mascillino put Miller inside B12, Miller did not know where Officer Mascillino had "walked off to" when Bryant, the keep-separate, came in. (*Id.* at 104:19–105:6.) On the other hand, Officer Mascillino testified that he did not know Miller and Bryant were keep-separates and that Miller did not inform him about Bryant being a keep-separate. (Dkt. 52 ¶ 19; Dkt. 42-3, Mascillino Dep., at 65:14–16, 71:2–17.)

Both *Kingsley* and *Miranda* emphasize that a defendant must act with more than mere negligence to be liable under the Fourteenth Amendment; and whether Officer Mascillino acted with more than negligence, or objectively unreasonably, is disputed. *See Kingsley*, 576 U.S. at 396; *Miranda*, 900 F.3d at 353; *see also Pittman*, 970 F.3d at 827–28. If, as Miller testified, Officer Mascillino knew about the keep-separate order and that Bryant would be placed in B12, yet ignored Miller's warning, a reasonable jury could find that the officer acted purposefully, knowingly, or recklessly, and in an objectively unreasonable way, when he placed Miller in B12 and walked off.

Finally, Defendants further argue that Officer Mascillino was not deliberately indifferent because the record shows either that Miller started the fight in B12 by throwing the first punch or that Miller and Bryant were mutual combatants. (Dkt. 58 at 15–16.) Miller responds that he

16

testified that when Bryant entered B12, Miller initially backed away. (Dkt. 52 ¶¶ 26–28.) In support, Miller cites portions of his deposition indicating that B12 is a concrete room large enough to hold only approximately 30 inmates, that an officer brought Bryant's group into B12 and shut the door, and that Miller initially backed away from Bryant and was trying to avoid an altercation with him before they charged each other. (Dkt. 42-2 at 106–09, 246.) In the light most favorable to Miller, a reasonable jury could find that these facts support Miller's implied contention that he fought Bryant to defend himself, as he had been placed against his will in a confined space with no accessible exit and no officer present to protect him. If, however, the jury believes that Miller was the sole aggressor, his own actions (not Officer Mascillino's) might be the superseding cause of his injuries. *See Hunter v. Mueske*, 73 F.4th 561, 568–69 (7th Cir. 2023). However, "in 1983 cases, causation is typically a question best left for the jury." *Id.* at 568. A jury should decide whether Officer Mascillino proximately caused the fight or whether Miller's behavior was a superseding cause. Taking the facts of the B12 incident in the light most favorable to Miller, a reasonable jury could find that Officer Mascillino failed to protect him in violation of the Fourteenth Amendment.

### B.    The ASU Incident

Defendants argue that the ASU incident, which involved Officers Anderson and Murphy, cannot give rise to a Fourteenth Amendment claim for two reasons: first, Miller did not suffer any harm from the incident; and second, no evidence suggests that Officer Anderson or Officer Murphy acted unreasonably. (Dkt. 58 at 16–20.)

As to Defendants' first argument, there must be evidence that Miller suffered an actual injury for Miller to survive summary judgment. *See Fisher v. Lovejoy*, 414 F.3d 659, 661–62 (7th Cir. 2005) ("[N]ot every injury suffered by a detainee violates his rights. The Supreme Court has

recognized that inmates are entitled to relief only when their injury is objectively serious . . . ."); *Niehus v. Liberio*, 973 F.2d 526, 531–32 (7th Cir. 1992) ("There is no tort without an injury, and this is as true of constitutional as of ordinary torts.") (citations omitted); *Kemp*, 27 F.4th at 496–97 (explaining that pretrial detainee in failure-to-protect case must provide evidence that correctional officer's conduct caused injuries); *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (noting in Eighth Amendment context that for conditions-of-confinement claim, "we look for physical injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain") (internal quotation marks and citations omitted); *Doe v. Welborn*, 110 F.3d 520, 523 (7th Cir. 1997) (requiring "proof of actual injury" to bring conditions-of-confinement claim); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983) ("[T]ort damages cannot be awarded if there is no injury."); *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (noting that a pretrial detainee cannot establish a failure-to-protect claim without presenting "sufficient evidence to establish that he suffered an objectively serious deprivation").

The Amended Complaint alleges that Miller suffered a fractured finger. (Dkt. 26 at 3 ¶ 6.) As noted above, however, Defendants' Local Rule 56.1 statement of facts makes clear that Miller admitted repeatedly at his deposition that he did not sustain a fracture to any part of his body, including his hand or finger. (Dkt. 52 ¶¶ 55, 57; Dkt. 42-2, Miller Dep., at 153:12–154:2, 169:22–170:15, 205:13–15.) In response, Miller does not directly dispute that he did not suffer a fractured finger due to the ASU incident, but notes that he also testified to being told by a physician that he suffered a torn tendon due to the incident. (Dkt. 52 ¶¶ 55, 57; Dkt. 42-2, Miller Dep., at 170:18–172:15.) Miller's testimony about what he had been told by a physician does not create a genuine

dispute of fact for the jury. To start, Miller mentioned and cited this testimony only in response to Defendants' statement of facts and declined to submit his own statement of additional facts. Thus, this testimony was not properly presented under Local Rule 56.1 as evidence warranting the denial of summary judgment. More important than this technical violation, Miller's testimony about what the physician said is inadmissible hearsay, *see* Fed. R. Evid. 801(c), 802; thus, the testimony does not create a genuine dispute of fact for trial.

Also not properly put forth in a Local Rule 56.1 statement is Miller's scattered discussion of other potential injuries in the record. His response brief and deposition mention scar tissue and lack of dexterity. (Dkt. 61 at 9; Dkt. 42-2, Miller Dep., at 154:1–11.) And Miller's deposition and grievances may suggest that he started receiving pain medication a week after the incident (Dkt. 61-2 at 5); X-rays of his hand were taken (Dkt. 42-2, Miller Dep., at 153:15–21; Dkt. 61-2 at 6); and a doctor gave him a splint (Dkt. 42-2 at 154:23–156:14; Dkt. 61-2 at 5). But, Miller did not submit his own statement of additional facts or cite these particular portions of the record in his response to Defendants' Local Rule 56.1 statement of facts, which means these portions of the record lack the benefit of the adversarial process. The Court declines to rely on these portions of the record without the benefit of that process and is "entitled to strictly enforce Local Rule 56.1 by 'limit[ing] its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Rule 56.1] statements.'" *KFC Corp. v. Iron Horse of Metairie Rd., LLC*, No. 18 C 5294, 2020 WL 3892989, at *7 (N.D. Ill. July 10, 2020) (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000)); *see also Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).

Without evidence of a physical injury, Miller would have to provide evidence of psychological pain, which he has not done. *See Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir.

2003) (explaining in Eighth Amendment context that physical injury is not needed to state a cause of action where there is "wanton infliction of psychological pain"); *Doe v. Welborn*, 110 F.3d at 524 (explaining in Eighth Amendment context that "purely psychological" injury in conditions-of-confinement case may be cognizable as long as injury reflects the deprivation of "the minimal civilized measures of life's necessities") (citations omitted).

Because Miller has not properly identified evidence of an actual injury, the Court need not address Defendants' second argument regarding the reasonableness of Officers Anderson and Murphy's actions.

The Court grants Defendants' motion for summary judgment as to the ASU incident.

## III. Qualified Immunity

The Court has granted summary judgment on the claims relating to the ASU incident and on some of the claims relating to the B12 incident; thus, only the individual-capacity claim against Officer Mascillino relating to the B12 incident remains. Defendants argue that qualified immunity shields Officer Mascillino from liability. Defendants contend that *Miranda* changed the law on the required mental state for Fourteenth Amendment claims from deliberate indifference to objective unreasonableness and argue that they should not be expected to anticipate such changes. (Dkt. 58 at 20–21.)

Qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). The test for qualified immunity has two prongs: (1) whether the facts indicate that a defendant's conduct violated some constitutional right of the plaintiff, and (2) if so, whether the constitutional right at issue was "clearly established" at the time of the alleged

violation. *Id.* at 232; *see also Jones v. Wilhelm*, 425 F.3d 455, 460 (7th Cir. 2005). To be "'clearly established,' a right must be defined so clearly that every reasonable official would have understood that what he was doing violated that right." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Once a defendant raises qualified immunity, the plaintiff bears the burden to defeat it. *Estate of Davis v. Ortiz*, 987 F.3d 635, 638–39 (7th Cir. 2021).

The Court lacks the benefit of fulsome briefing on this issue. Defendants briefly address qualified immunity in their opening memorandum and omit any discussion of the issue in their reply, while Miller does not respond to the issue at all. (Dkt. 58 at 20–21; Dkt. 61; Dkt. 62.) Nonetheless, Miller satisfies the first prong. As noted above, evidence exists from which a reasonable jury could conclude that Officer Mascillino violated Miller's Fourteenth Amendment rights with regard to the B12 incident.

Miller also satisfies the second requirement, that the constitutional right violated was clearly established at the time of the violation. Miller alleges that Officer Mascillino's placement of Miller in B12 with a keep-separate on the way was objectively unreasonable. Case law predating the B12 incident, which occurred on November 10, 2015, clearly established Miller's Fourteenth Amendment right to be free from violence perpetrated by fellow detainees. *Farmer v. Brennan* is an example. 511 U.S. 825 (1994). *Farmer* was an Eighth Amendment case, but as *Miranda* noted, the Seventh Circuit has "typically assessed pretrial detainees' medical care (and other) claims under the Eighth Amendment's standards, reasoning that pretrial detainees are entitled to at least that much protection." 900 F.3d at 350. The Seventh Circuit also has explained that "[t]he Due Process Clause of the Fourteenth Amendment protects pre-trial detainees from punishment and places a duty upon jail officials to protect pre-trial detainees from violence." *Fisher v. Lovejoy*,

21

414 F.3d 659, 661 (7th Cir. 2005). Again, these cases predate the B12 incident, which occurred on November 10, 2015.

That *Miranda* and *Kemp* applied *Kingsley*'s objective reasonableness standard to Fourteenth Amendment claims does not change the qualified immunity analysis. The Seventh Circuit had clearly established a duty to protect pretrial detainees from serious harm by others in custody well before November 2015. *See, e.g.*, *Brown*, 398 F.3d 904, 910–11 (7th Cir. 2005); *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000); *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785, 788–89 (7th Cir. 1995). While these cases used *Farmer*'s two-prong deliberate-indifference standard rather than the objective reasonableness standard that governs such claims today, a reasonable jury could find that Mascillino violated even the more stringent subjective standard that *Farmer*, *Brown*, *Weiss*, and *Billman* clearly established. *See, e.g.*, *Brown*, 398 F.3d at 913–14; *Weiss*, 230 F.3d at 1032; *Billman*, 56 F.3d at 788.

Starting with the first prong, to show deliberate indifference a plaintiff must first show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Brown*, 398 F.3d at 910 (quoting *Farmer*, 511 U.S. at 834). Placing two detainees together with a keep-separate order would violate that standard. *See Miller v. Fisher*, 219 F. App'x 529, 532 (7th Cir. 2007) (describing a keep-separate order as "itself a statement of the risk" of potential violence).

Turning to the second prong, Miller must show that Mascillino was subjectively aware of the risk such conditions could cause and disregarded that risk. *See Brown*, 398 F.3d at 913. As we are at the summary judgment stage, the parties' dispute over whether Mascillino knew that Miller and Bryant had a keep-separate order must be resolved in Miller's favor as the nonmovant. (*Compare* Dkt. 42-2, Miller Dep., at 102:13–103:8, 199:21–120:16, *with* Dkt. 52 ¶ 19, *and* Dkt. 42-3, Mascillino Dep., at 65:14–16, 71:2–17.) *See also F.T.C. v. Bay Area Bus. Council, Inc.*,

423 F.3d 627, 635 (7th Cir. 2005). Knowledge of a keep-separate order would have made Mascillino "subjectively aware of the risk," *Farmer*, 511 U.S. at 829, that the detainees could cause each other serious harm, because the orders are designed to avoid interaction between certain inmates for safety purposes. *See* (Dkt. 52 ¶ 13); *Miller*, 219 F. App'x at 532; *see also Gevas v. McLaughlin*, 798 F.3d 475, 478, 481 (7th Cir. 2015) (noting that prisoner's request to be kept separate from potential assailant constituted evidence that defendants knew the prisoner was in danger of being harmed). Mascillino's own deposition testimony indicates he possessed knowledge of LCJ's keep-separate orders and their safety ramifications. (*E.g.*, Dkt. 42-3, Mascillino Dep., at 27:1–22, 34:9–19, 37:20–38:11.) Thus, his placing of two inmates together, despite knowing of such an order, would violate the deliberate-indifference standard. *Cf. Mays v. Sprinkle*, 992 F.3d 295, 301–02, 305 (4th Cir. 2021) (holding that subjective knowledge of a detainee's serious medical condition defeated qualified immunity on a motion to dismiss, even if *Kingsley* lowered the standard for such claims going forward); *Ortiz v. City of Chicago*, 656 F.3d 523, 538–39 (7th Cir. 2011) (holding the same in a Fourth Amendment case as applied to an arrestee).

Defendants' argument that *Miranda*[7] "forbade conduct not previously identified as unlawful," (Dkt. 58 at 21 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))), is perhaps true, though inapposite. As just discussed, in the light most favorable to Miller, Mascillino's actions violated even the subjective standard that was clearly established in the Seventh Circuit before November 2015. Thus, the change in law wrought by *Kingsley* does not change the result here: Mascillino's qualified immunity defense fails.

---

[7] More specifically, *Kemp* applied *Kingsley* to Miller's exact claim in this case, but the Seventh Circuit decided *Kemp* after briefing concluded, so Defendants understandably cite *Miranda* instead.

Every reasonable official would have understood that placing two keep-separates together would violate the duty to protect. *See Miller*, 219 F. App'x at 532 (describing a keep-separate order as "itself a statement of the risk" of potential violence). Defendants' argument that *Miranda* "forbade conduct not previously identified as unlawful" is thus not persuasive. *C.f., e.g.*, *Ortiz*, 656 F.3d at 538–39 (denying qualified immunity despite uncertainty over whether the "deliberate indifference" or "objectively unreasonable" standard governed medical care claims for arrestees); *Hardeman v. Cnty. of Lake*, No. 17-cv-08729, 2018 WL 3533254, *4 (N.D. Ill. July 23, 2018); *Terry v. Cnty. of Milwaukee*, No. 17-cv-1112-JPS, 357 F. Supp. 3d 732, 749–50 (E.D. Wis. 2018).

## Conclusion

Defendants' motion for summary judgment (Dkt. 58) is denied as it relates to the individual-capacity claim against Officer Mascillino regarding the B12 incident, granted with respect to all other claims regarding the B12 incident, and granted with respect to the ASU incident. Miller may proceed on the individual-capacity claim against Officer Mascillino. A status hearing is set for October 5, 2023, at 10:00 a.m. in person in Courtroom 1925. By October 3, 2023, the parties shall file a joint status report updating the Court on the prospects of settlement and availability for a trial between April 15, 2024 and May 31, 2024, with an estimate of trial days needed.

Date: 9/26/23

Nancy L. Maldonado
United States District Court Judge